UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------x
OMAR MORRISON, individually   :
and on behalf of other        :
similarly situated Assistant  :
Store Managers,               :
                              :
              Plaintiffs,     :
                              :
v.                            :      Civil No. 3:09CV1285(AWT)
                              :
OCEAN STATE JOBBERS, INC.     :
                              :
              Defendant.      :
-----------------------------x
```

**RULING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND
DEFENDANT'S MOTION TO DECERTIFY FLSA COLLECTIVE ACTION**

Plaintiffs Omar Morrison, Manuel Toppins and Carli Galasso,
move for certification of two classes: the first class consisting
of all persons who have worked for the defendant, Ocean State
Jobbers, Inc. ("Ocean State"), as an Assistant Manager ("ASM") in
Connecticut at any time between December 4, 2007 and the date of
final judgment in this matter; and the second class consisting of
all persons who have worked for the defendant as an ASM in
Massachusetts at any time between August 31, 2008 and the date of
final judgment in this matter.  The plaintiffs claim that the
defendant misclassified them as exempt from overtime under
Connecticut and Massachusetts state labor laws requiring
employers to pay all employees one and one-half times their
regular rate of pay for time worked in excess of 40 hours during
any workweek unless the employer can demonstrate that the

1

employee is exempt.  The defendant contends that the plaintiffs cannot meet the requirements of Fed. R. Civ. P. 23 and therefore the proposed classes cannot be certified.  The plaintiffs' motion is being granted as to the Connecticut class of plaintiffs only.

On May 17, 2010, the court granted the plaintiffs' Motion to Proceed as a Collective Action and to Authorize Notice to Individuals.  Twenty-five individuals have filed notices with the court consenting to join the collective action.  The defendant moves for decertification of the plaintiffs' Fair Labor Standards Act ("FLSA") Collective Action, arguing that the opt-in plaintiffs have failed to produce evidence that they are similarly situated as required by 29 U.S.C. § 216(b).  The defendant's motion is being denied.

## I.   FACTUAL BACKGROUND

Ocean State Jobbers, Inc. opened the first Ocean State Job Lot store in North Kingston, Rhode Island in 1977.  Ocean State defines itself as an "opportunistic merchant[]" with the goal of selling "brand name, first quality products at closeout prices." (Pl.'s Ex. A 1).  Ocean State currently operates one hundred stores with 4,000 employees throughout New England and New York. Ocean State focuses on "mak[ing] money by putting [its] best items in prime locations, building powerful visual presentations, and signing them properly."  (Management Training and Development Guide, Doc. No. 148-2 at 60).  "The steady, sizable flow of new

goods into [a] store requires constant planning and attention to freight flow. . . . Under normal circumstances, the company freight flow turnaround goal - from shipping truck to sales floor - is 24-hours." Id. at 61.

Ocean State employs both exempt and non-exempt employees in a variety of positions.  Hourly positions include the Area Supervisor, Operations Supervisor, Visual Merchandiser, Front End Supervisor, Department Head, Sales Associate and Maintenance Associate.  Exempt positions include the Store Manager, the Assistant Manager ("ASM") and the Operations Assistant Store Manager[1].

The ASM position is defined as being "responsible for the timely and consistent execution of all Merchandising, Operational, and Human Resource policies and procedures within a designated retail location in accordance with the philosophy and standards of the company.  The Assistant Manager participates in managing the entire store while maintaining specific areas of responsibility."[2] Assistant Manager Position Description, Doc.

---

[1]The Operations Assistant Manager is included in the proposed class of Assistant Managers.

[2]Essential duties and responsibilities of the ASM include:
- Protect Company assets.
- Drive sales through the proper execution of company programs.
- Perform assigned responsibilities within a specific location to company standards.
- Inventory control in specific areas of responsibility through proper communication to

No. 148-4).  The Operations Assistant Store Manager position is

defined as working under the direction of the Store Manager and

being "responsible for the effective administration of all

Operational and Human Resource policies and procedures."[3]

--------

                    the buyers and auto replenishment specialist.
          -    Maintain  timely  compliance  to company
               directives   regarding   Operational,
               Merchandising and Human Resources policies,
               procedures, and programs.
          -    Monitor customer service to ensure the quality
               of   service   is   commensurate   with   the
               expectations of the customer.
          -    Supervise and train assigned store Associates
               within areas of responsibility.
          -    Maintain a professional working relationship
               with the Store Management, store associates,
               and Field Management at the location assigned.
          -    Ensure the store operates at the same level
               when the Store Manager is out of the store as
               it does with the Store Manager present.
     (Pl.'s Ex. C).

     [3] Essential duties and responsibilities of the Operations
Assistant Store Manager include:
          -    Protection of Company assets.
          -    Oversee all functions within the Operations
               office including but not limited to Cash
               Handling, Payroll Processing, Loss Prevention,
               Safety and Human Resource functions.
          -    Ensure the accuracy of Inventory Control by
               research of Sales Exceptions identified on the
               Store   Performance   Report,   including
               communication to the buyers and to the auto
               replenishment specialists.
          -    Complete Monthly Operational Self Audits to
               ensure timely compliance to company policy.
          -    Work with the Merchandising Assistants to
               ensure a 24-hour turn around of incoming
               freight and proper backroom management.
          -    Monitor the Front End to ensure the quality of
               service is commensurate with the expectations
               of the customer.
          -    Manage the Hire for Success program to fill

(Operations Assistant Store Manager Position Description, Doc.
No. 148-5).  During an internal review in 2004, Ocean State
determined, based on the job descriptions and conversations with
"various assistant managers," that ASMs could all be classified
as exempt.  (Dep. of Richard Portno, Feb. 8, 2011, Doc. No. 148-
16 at 52-54).

     Many of the tasks at Ocean State are carefully dictated by
policies and procedures promulgated by the central office in
Rhode Island.  The Management Training and Development Guide (the
"Guide") includes detailed instructions covering areas such as
Safety and Loss Prevention, Merchandising and Inventory Control
and Human Resources.  Within the merchandising section, detailed
instructions are provided for different departments.  The Guide
also provides management with a daily to-do list.  Every day a
member of management must tour the store and ensure compliance
with the plan-o-grams, which are instructions sent regarding
merchandise positioning and signage throughout the store.  Three

---

                    store   needs   while   adhering   to   the   Base
                    Schedule program.
          -         Ensure   timely   processing   of   Damage   and
                    Defective merchandise.
          -         Maintain compliance to all Operational CPP's.
          -         Develop   a   stable,   knowledgeable   store
                    organization   through   the   administration   of
                    company training programs.
          -         Monitor and follow up on all store, equipment,
                    and floor care Maintenance issues.
          -         Maintain a close working relationship with the
                    District   Operations   Manager   and   District
                    Merchandising Manager.

times a week a Top 40 list of best-selling items is distributed to the stores listing the most popular items according to overall sales across the chain, reporting the store's expected sales volume of that particular item and the actual sales volume.  If a store underperforms on a specific item, management is expected to review placement and presentation of the item.

Just as many of the merchandising tasks are carried out in accordance with policies promulgated by the central office, human resources tasks are closely managed, often through the use of prescribed forms.  For example, when a job applicant comes into a store, a pre-screen interview form is filled out.  The pre-screen interview form contains approximately half a dozen questions that must be asked and takes very little time to complete.  If a job applicant survives the pre-screen process, a more thorough second interview is done.  The mandatory interview form for the second interview includes suggested ice breaker questions and a series of twelve questions with a list of attributes that are assigned either a positive or negative numerical value.  Forms are also provided for use during annual and semi-annual associate reviews and for disciplinary purposes.

While all Ocean State stores follow the same centrally mandated policies and procedures, there are variations in the day-to-day tasks and responsibilities performed by ASMs depending on the Ocean State location.  Several members of the proposed

6

class testified that the extent and nature of their responsibilities depended on the Store Manager.  For example, Selma Cherry testified that "[e]verybody has their own little personality and the way they handle and delegate things." (Dep. of Selma Cherry, Mar. 14, 2011, Doc. No. 183-1 at 8); see also (Dep. of Peter Vella, Mar. 15, 2011, Doc. No. 183-4 at 9-10); (Dep. of Erik Curtiss, Mar. 14, 2011, Doc. No. 183-11 at 11); (Dep. of Christopher Dubriske, June 30, 2011, Doc. No. 183-34 at 4).  In addition, while some ASMs stated that they did no hiring, others stated that they performed the initial pre-screen interviews of applicants, and still others stated that they conducted the more extensive second interviews as well.  Compare (Dep. of Selma Cherry, supra, at 11 ("I didn't do much of hiring or anything")), with (Dep. of Carli Galasso, Mar. 18, 2011, Doc. No. 148-17 at 48 ("We did the prescreen interview. The store manager did the actual sit down interview.")), and (Dep. of Paula Kraft, May 2, 2011, Doc. No. 183-9 at 11 (When asked about her involvement in hiring she stated "I would do the pre-screening.")), with (Dep. of Peter Vella, supra, at 22 ("Q. Were you involved in conducting interviews as an assistant manager? A. Yes.")).  Similarly, whether an ASM drafted and participated in an associate's annual or semi-annual review varied depending on the store.  (Dep. of Sandra Carnelli, Dec. 20, 2010, Doc. No. 183-3 at 5-6 ("Q. So it was different from store to store for

you? A. Yes.")).  While many ASMs stated that they had authority
to administer discipline to an associate, several others stated
that they did not.  Finally, while the majority of ASMs stated
that they did not participate in preparing the associate
schedule, there were several who either stated that they had been
involved in scheduling at one point or they knew of another ASM
who drafted the associate schedule. <u>See</u> (Dep. of Virginia Bisson,
Mar. 16, 2011, Doc. No. 183-5 at 16); (Dep. of William Britt, May
3, 2011, Doc. No. 183-6 at 165); (Dep. of Manuel Toppins, Mar.
17, 2011, Doc. 183-23 at 13-14).

Each member of the proposed class testified that he or she
spent a majority of his or her time performing manual tasks, in
particular pushing freight.  However, the estimates as to the
amount of time spent pushing freight varied from at least 50%,
see Dep. of Donna Gaudette, May 3, 2011, Doc. No. 183-7 at 9, to
90%, see Dep. of Omar Morrison, Dec. 14, 2010, Doc. No. 183-21 at
15. Several ASMs testified that their supervisors encouraged them
to do less hands-on work personally and to delegate more of the
physical labor to their associates.  <u>See</u> (Dep. of William Britt
23 ("[A]t the end of the day they always think that the
associates should do more work than the assistants or the store
managers.")); (Dep. of Sandra Carnelli 7-9 ("Well, they used to
tell me I work too much on the floor, I'm too much hands-on.")).
Supervision of associates while an ASM was pushing freightwas

done through the "Come See Me" program, under which associates were instructed to report to the ASM when they had a question or had completed an assigned task to receive further direction. (See Annual Evaluation Form, Doc. No. 148-42).

## II.  DISCUSSION

### A.  Class Certification Under Rule 23

In Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011) the Court stated:

> The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  In order to justify a departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.  The Rule's four requirements - numerosity, commonality, typicality, and adequate representation – "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."

Id. at 2550 (internal citations omitted).

A class action may be maintained if the four prerequisites of Rule 23(a) are satisfied and the case falls within one of the three categories described in Rule 23(b).  The plaintiffs seek certification under Rule 23(b)(3).  Where all of the requirements under Rule 23(a) and 23(b) are met "'the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.'"  General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 155 (1982)

9

(quoting <u>Califano v. Yamasaki</u>, 442 U.S. 682, 701 (1979)) (alterations in original).  "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met."  <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010).

The plaintiffs claim that the defendant wrongfully failed to pay them overtime wages by misclassifying them as exempt employees.  For the reasons discussed below, the court finds that the four prerequisites under Rule 23(a) and the Rule 23(b)(3) predominance requirement have been satisfied as to the class of Connecticut plaintiffs.  However, as to the class of Massachusetts plaintiffs, the court finds that the predominance requirement has not been met and therefore does not address the four prerequisites under Rule 23(a).

**1. Connecticut Plaintiffs**

**a. Numerosity**

The prerequisite stated in Rule 23(a)(1) is that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Numerosity is presumed at a level of 40 members."  <u>Consolidated Rail Corp. v. Town of Hyde Park</u>, 47 F.3d 473, 483 (2d Cir. 1995).  The plaintiffs represent that a list of at least 109 current and former Connecticut ASMs has been provided to them, and the defendant does not appear to dispute numerosity.  The court finds that the prerequisite of numerosity

10

is satisfied.

### b. Commonality

The prerequisite stated in Rule 23(a)(2) is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" <u>Dukes</u>, 131 S. Ct. at 2551 (quoting <u>Falcon</u>, 457 U.S. at 157). "This does not mean merely that they have all suffered a violation of the same provision of law." <u>Id.</u> Rather, "[t]heir claims must depend upon a common contention . . . . That common contention, moreover, must be of a nature that is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u> "Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" <u>Falcon</u>, 457 U.S. at 155. Determination of commonality requires a rigorous analysis that "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim." <u>Dukes</u>, 131 S. Ct. at 2551.

The Connecticut plaintiffs contend that they were misclassified as exempt under the Connecticut Minimum Wage Law ("CMWL"). Connecticut law excludes from the definition of an

employee eligible for overtime "an individual employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner."  Conn. Gen. Stat. 31-58(f).

> For the purposes of section 31-58(f) of the general statutes, as amended, "employee employed in a bona fide executive capacity" means any employee (1) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and (2) who customarily and regularly directs the work of two or more other employees therein; and (3) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and (4) who customarily and regularly exercise[s] discretionary powers; and (5) who does not devote more than twenty percent, or, in the case of an employee of a retail or service establishment who does not devote as much as forty percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in subdivisions (1) to (4), inclusive, of this section. . . and (6) who is compensated for his services on a salary basis at a rate of not less than four hundred dollars per week . . . .

Regs. Conn. State Agencies § 31-60-14.

> The minimum wage law . . . should receive a liberal construction as regards beneficiaries so that it may accomplish its purpose.  In furtherance of that principle, it is essential that exemptions or exclusions be strictly and narrowly construed.  The burden rests on the employer to establish that his employees come within an exemption.

Shell Oil Co. v. Ricciuti, 147 Conn. 277, 282-83 (1960).

The Connecticut plaintiffs have articulated a common question, namely, whether they were misclassified as exempt from

CMWL overtime requirements because they are not within the bona fide executive exemption. This common question, however, is insufficient, in and of itself, to establish the prerequisite of commonality because it merely asks whether each of the Connecticut plaintiffs has suffered a violation of the same provision of law. To satisfy the commonality prerequisite the Connecticut plaintiffs must also identify common contentions the resolution of which are central to determining the validity of their claim.

Determining whether the Connecticut plaintiffs were properly classified as exempt under CMWL requires deciding whether each of the six requirements listed in the Connecticut regulation was met. A finding that any one of the requirements had not been met is dispositive with respect to the bona fide executive exemption analysis. The Connecticut plaintiffs provided evidence as to common contentions on a number of the requirements listed in the regulation, including: that each plaintiff did not customarily and regularly direct the work of two or more other employees; that each plaintiff did not have the authority to hire or fire employees or make recommendations as to the advancement or promotion of associates; that each plaintiff did not exercise discretionary authority; and that each plaintiff spent more than 40% of his or her work week on activities unrelated to management. Proof that any one of these contentions is true

13

would establish that one of the requirements for exempt status
was not met and therefore the Connecticut plaintiffs were
entitled to overtime compensation.  As a result, each of these
contentions is such that a finding in favor of the Connecticut
plaintiffs would resolve an issue central to the validity of
their claim for overtime benefits under the CMWL.

The defendant argues that the individual nature of the
Connecticut plaintiffs' job responsibilities results in
dissimilarities within the proposed class such that a class-wide
proceeding would not generate "common answers" to either the
common question or the common contentions listed above.  However,
the Connecticut plaintiffs only need to show that one of the six
requirements listed in the regulation is not satisfied to
establish that they were misclassified as being within the bona
fide executive exemption.  The Connecticut plaintiffs have
provided evidence that each of them spends in excess of 40% of
their time on non-managerial activities.  As a result, the
plaintiffs have identified a common contention capable of class-
wide resolution that is central to the validity of the CMWL
claim.[4]  Therefore, the prerequisite of commonality is satisfied.

_____

[4]Because the court finds that the plaintiffs have provided
evidence sufficient to satisfy the prerequisite of commonality
based on the 40% requirement, it does not consider whether
sufficient evidence was produced in relation to any of the other
common contentions identified above.

### c. Typicality

The prerequisite stated in Rule 23(a)(3) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

> Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.

Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993). The defendant argues that the requirements for typicality are not satisfied because the plaintiffs "focus on the same 'decision to classify ASMs as exempt' as opposed to focusing on whether the answers to the questions posed are in fact typical." (Def. Br. in Opp. (Doc. No. 183) at 24-25). The test for typicality does not, as the defendant suggests, focus on the court finding typical answers to the questions posed. Here the plaintiffs' CMWL claim arises from a single event, the defendant's decision to classify ASMs as exempt, and each class member makes the same legal arguments, that they were misclassified under the pertinent Connecticut regulation as being covered by the bona fide executive exemption. Therefore, the court finds that the prerequisite of typicality is satisfied.

### d. Adequate Representation

The prerequisite stated in Rule 23(a)(4) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "A plaintiff can show that it adequately represents the interests of the class, pursuant to Rule 23(a)(4), if it appears that plaintiff's interests are not antagonistic to those of the class it seeks to represent and plaintiff's counsel is qualified to conduct the litigation."  Macedonia Church v. Lancaster Hotel Ltd. P'ship, 270 F.R.D. 107, 118 (D. Conn. 2010) (quoting In re Flight Safety Tech., Inc. Sec. Litig., 231 F.R.D. 124, 128 (D. Conn. 2005)). The defendant does not appear to challenge the competency of the plaintiffs' counsel.  However, the defendant argues that Morrison has not shown that he will fairly and adequately represent the class for three reasons.

First, the defendant challenges Morrison's knowledge of the case, arguing that he has never spoken with another plaintiff, could not recognize any of the other plaintiffs' names, has not seen or reviewed any discovery submitted by another party in the lawsuit, and "has no idea how many Ocean State Job Lot stores even exist in Connecticut."  (Def.'s Br. in Opp., at 28).  "Class representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to

16

protect the interests of the class against the possibly competing interests of the attorneys.'" Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 61 (2d Cir. 2000) (quoting Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995)).  However, the Supreme Court has "expressly disfavored attacks on the adequacy of a class representative based on the representative's ignorance." Id. (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-74 (1966)).

Morrison sought out counsel and signed a written representation agreement.  He has demonstrated an understanding of the basis for this case, i.e., the failure of the defendant to pay him overtime based on its decision to classify him as an exempt employee, and of what it means to be a plaintiff in this lawsuit.  That Morrison relies on his attorneys to manage issues relating to discovery and dealing with the other class members does not demonstrate his "ignorance of the litigation or his inability to serve as class representative, it demonstrates [his] ability to appreciate the limits of his knowledge and rely on those with the relevant experience." Id. at 62.

Second, the defendant contends that Morrison has credibility issues that will cast a shadow over the case as a whole based upon (1) his prior experience as a plaintiff in the same type of lawsuit against at least two former employers, and (2) misrepresentations in his Ocean State job application relating to

his ownership of an "adult video" company.  "To judge the
adequacy of representation, courts may consider the honesty and
trustworthiness of the named plaintiff." Savino v. Computer
Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998).

Regarding Morrison's participation in lawsuits against two
prior employers, the court notes that it rejected a similar
argument in its Ruling on the Motion to Proceed as a Collective
Action and to Authorize Notice to Individuals in the Putative
Collective Action, where it stated that "the plaintiff's claims
against other employers do not have any bearing on whether or not
Ocean State violated the FLSA in connection with its employment
of Assistant Store Managers." (Doc. No. 42 at 14.)  As to the
question presented here, the defendant points to the mere fact
that Morrison has brought the same type of lawsuit against at
least two prior employers.  That fact alone is not a sufficient
basis to conclude that Morrison would not be perceived as
credible by an impartial fact finder.

As to Morrison's Ocean State job application, he represented
that he was employed by an adult video company which he actually
owned.  He further represented in his job application that an
individual named Ganina was his supervisor at the adult video
company and thus a credible reference; this could not have been
the case given his ownership of the company.  These statements,
while they could be used to impeach Morrison, do not persuade the

18

court that he can not be trusted to represent the members of the class.

Third, the defendant contends that Morrison filed two discrimination complaints with the State of Connecticut Commission on Human Rights and Opportunities against Ocean State, which may require him to make arguments that are contrary to the interests of the class. The defendant relies on Savino v. Computer Credit, Inc., where the Second Circuit affirmed the denial of Rule 23 class certification because the lead plaintiff had already offered "different accounts about the letters that form the very basis for his lawsuit," leading the district court to conclude that he was not an adequate class representative. 164 F.3d at 87. The defendant does not point to any statement made or reasonably expected to be made by Morrison that would contradict his allegations in this action or be contrary to the interests of the class. The defendant merely speculates that Morrison may, in an unrelated case before a different adjudicatory body, make statements that could be contrary to the interests of the class. Such speculation is not a sufficient basis for concluding that Morrison is not an adequate representative. Therefore, the court finds that the prerequisite of adequate representation is satisfied.

### e. Predominance

"Rule 23(b)(3) . . . requires the party seeking

certification to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010) (quoting Fed. R. Civ. P. 23(b)(3)).

> The requirement's purpose is to "ensure[] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" Therefore the requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."

Id. (internal citations omitted) (alterations in original). "'Rule 23(b)(3) requires that the district court determine what questions of law or fact are common to the members of the class." Id. at 548.

In Myers, the court found that the predominance requirement under Rule 23(b)(3) had not been met in a case involving legal and factual questions very similar to those at issue here. The court stated that resolution of the case turned on "1) whether plaintiffs were denied overtime and 2) whether plaintiffs were entitled to overtime under FLSA." Id. at 548 (emphasis in original). While the first issue was "a simple factual matter and [was] not in dispute, the second [was] a complex, disputed issue" whose ultimate resolution would "require the district

20

court to decide a number of subsidiary questions" in determining whether the plaintiffs were covered by the bona fide executive exemption.  Id.  The court found that exemption under the FLSA regulations is a "mixed question of law and fact, involving a number of subsidiary questions, each of which may or may not be able to be proven in common with respect to all [class members]," and that determination of these questions "should be resolved by examining the employees' actual job characteristics and duties." Id.  Class certification would be granted only "if the plaintiffs [could] show that 'some' of the above questions [could] be answered with respect to the members of the class as a whole 'through generalized proof' and that those common issues are 'more substantial' than individual ones."  Id. at 549. "[E]vidence tending to show that the plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria," while not dispositive of the overall predominance inquiry, would "tend to show that the subsidiary questions involved in resolving exemption will be answerable through evidence generally applicable to the class."  Id.

As in Myers, the Connecticut plaintiffs are bringing a claim for overtime wages, but their claim is based on the CMWL rather than the FLSA.  Resolution turns on 1) whether the Connecticut plaintiffs were denied overtime, and 2) whether the Connecticut plaintiffs were entitled to overtime under the CMWL.  There is no

dispute that the defendant failed to pay the Connecticut
plaintiffs overtime for time worked in excess of 40 hours during
a workweek.  Thus, the pivotal inquiry here is what questions of
law or fact will be material in determining whether the
Connecticut plaintiffs were entitled to overtime under the CMWL.

An employee is exempt from overtime requirements as a bona
fide executive in a retail environment where each of six criteria
are met: (1) their primary duty consists of management; (2) they
customarily and regularly direct the work of two or more other
employees; (3) they have the authority to hire or fire other
employees or their suggestions or recommendations as to hiring or
firing and advancement and promotion are given particular weight;
(4) they customarily and regularly exercise discretionary powers;
(5) they do not devote more than 40% of their time to activities
other than those listed above; and (6) they are compensated on a
salary basis of at least $400 per week.  See Regs. Conn. State
Agencies § 31-60-14.  The employer bears the burden of
establishing that the employee is subject to the exemption.

The Connecticut plaintiffs have provided evidence pertaining
to a number of the requirements listed in the regulation,
including whether they customarily and regularly directed the
work of two or more other employees, whether they had the
authority to hire or fire employees or make recommendations as to
the advancement or promotion of associates, whether they

22

exercised discretionary authority, and the amount of time they spent on non-managerial activities.  The defendant argues that while it may have misclassified some of the employees included in the proposed Connecticut class, the Connecticut plaintiffs as a whole have failed to show that their jobs are similar enough so that there is generalized proof that is material to the establishment of the exemption criteria.  The court agrees with respect to three of the exemption criteria: whether the Connecticut plaintiffs customarily and regularly directed the work of two or more other employees, whether they had the authority to hire or fire employees, and the amount of discretion the Connecticut plaintiffs were afforded.  However, the Connecticut plaintiffs need only show that one of the six requirements was not met to establish that they were not covered by the bona fide executive exemption.

The Connecticut plaintiffs have provided evidence that each of them spent in excess of 40% of their time on non-managerial activities.  No member of the Connecticut class testified that he or she spent less than 50% of his or her time on non-managerial activities and most testified that they spent closer to 80% of their time on non-managerial activities.[5]  Consequently, the

---

[5]The defendant correctly argues that a time-spent analysis is not dispositive under Federal law and regulations.  (Def. Br. in Opp. 14).  However, the Connecticut regulation requires that a retail employee "not devote as much as forty percent" of his time to activities unrelated to his managerial responsibilities.

Connecticut plaintiffs have shown by a preponderance of the evidence that their jobs are similar enough in a respect material to, and potentially dispositive of, determination of their CMWL claim such that the common issue is more substantial than individual ones.  Therefore, the court finds that the predominance requirement is met.

Because the proposed class of Connecticut plaintiffs has satisfied the four requirements of Rule 23(a) and the predominance requirement of Rule 23(b)(3) as to their CMWL claim, the motion for class certification is being granted as to the Connecticut class.

### 2. Massachusetts Plaintiffs

The court concludes that the evidence produced by the Massachusetts plaintiffs is insufficient to establish by a preponderance of the evidence that they meet the predominance requirement of Rule 23(b)(3).  Consequently, the court does not address the four prerequisites under Rule 23(a).  See Myers, 624 F.3d at 548.

Under Massachusetts law, an employer must compensate any employee who works in excess of 40 hours at a rate of not less than one and one half times his regular rate except where the employee is subject to an exemption.  See Mass. Gen. Law 151, §1A.  One exemption is where the employee is employed "as a bona fide executive, administrative or professional person."  Mass.

Gen. Law 151, §1A(3).  In interpreting the term "bona fide executive, administrative or professional person" under Massachusetts law, Massachusetts expressly adopts the regulations applicable to the Fair Labor Standards Act, 29 U.S.C.   § 201 et seq.  "The terms 'bona fide executive, or administrative or professional person' in M.G.L. c. 151, §1A(3), shall have the same meaning as set forth in Part 541 of Title 29 of the U.S. Code of Federal Regulations."  455 Code of Mass. Reg. § 2.02(3); see also 29 CFR § 541.0.  As a result, Myers v. Hertz Corp., which addresses Rule 23 certification of an FLSA class, is directly on point.

The Code of Federal Regulations defines an "employee employed in a bona fide executive capacity as one who is:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).  "To qualify for exemption . . . , an employee's 'primary duty' must be the performance of exempt work. The term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700.

Therefore, for an employee to be exempt as one employed in a bona fide executive capacity his most important duty must be management of the enterprise.

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the types of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  While

> [t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. . . [t]ime alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.[6]

_____

[6]The regulations specifically state that:
> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt

29 C.F.R. § 541.700(b).

The Massachusetts plaintiffs contend that common questions predominate over individual ones.  Specifically, the Massachusetts plaintiffs identify three areas where they contend the evidence supports their position: first, that Ocean State made a single determination that all ASMs are exempt; second, that each of the plaintiffs testified that a majority of their time is spent on non-managerial duties; and third, that all ASMs have the same material duties and limitations on their authority, as evidenced by uniform training, by a single job description and as carefully dictated by policies and procedures disseminated by the central management office.

Ocean State's blanket decision to classify all ASMs as exempt is relevant to deciding whether the Massachusetts plaintiff's jobs were "similar in ways material to the establishment of the exemption criteria." Myers, 624 F.3d at 549.  However, "the existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common issues.'" Id. (quoting In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 957, 959 (9th Cir. 2009)). "[T]he question of entitlement to overtime pay is answered by

---

          employees, the assistant managers generally would
          not satisfy the primary duty requirement.
29 C.F.R. § 541.700(c).

examining the employee's actual duties." Id. at 550. Because
the exemption determination does not address any individual
plaintiff's actual duties, but rather the defendant's perception
of those duties en masse, "the fact of common exemption does not
establish whether all plaintiffs were actually entitled to
overtime pay or whether they were covered by the applicable
administrative regulations defining FLSA's exemptions." Id. at
549 (emphasis in original).

Similarly, the fact that each of the Massachusetts
plaintiffs who was deposed testified that he or she spent in
excess of 50% of his or her time on non-managerial activities is
relevant to but not dispositive of the primary duty
determination. See 29 C.F.R. § 541.700(b). ASMs were often
engaged in non-managerial tasks such as unloading freight.
However, they were also responsible for directing the work of
associates assigned to their department. Under the "Come See Me"
policy, if an associate finished an assigned task or had a
question he or she would approach the ASM for further direction.
The ASMs would also stop unloading freight to take regular walks
through the store. Some ASMs testified that if they observed an
employee breaking store policy, for instance by talking on a cell
phone instead of working, they would issue either a verbal or
written warning. Several ASMs testified that they would train
new associates by working side-by-side with them. Therefore,

many of the supervisory tasks that ASMs performed were performed
during times at which they may have also been engaged in
unloading freight or other non-managerial tasks.

Finally, the Massachusetts plaintiffs argue that their jobs
are similar in ways material to the exemption determination.  For
example, the plaintiffs all perform the job responsibilities
listed in the ASM job description provided by Ocean State.  In
addition, human resources tasks in particular are often reduced
to filling out forms provided by centralized management, i.e.
pre-screen interview forms, interview forms and performance
evaluations.

However, there were great variations in actual job duties
testified to by those Massachusetts plaintiffs who were deposed.[7]
For example, they testified to a range of responsibilities
regarding "interviewing, selecting, and training of employees";
the Massachusetts plaintiffs ranged from those who claimed very
little involvement in hiring, to those who performed solely pre-
screen interviews, to those who also performed the more thorough
second interviews.  As to "setting and adjusting their rates of
pay and hours of work," all the plaintiffs agreed that they could
not set rates of pay.  When it came to scheduling, however, their
experience varied based on the store.  While most of the

---

[7]For the purposes of this analysis, the court did not rely
upon any of the seven disputed declarations submitted by the
defendant.  <u>See</u> (Pl's Reply Mem. (Doc. No. 186) at *1-2).

plaintiffs stated that store managers drafted the schedule, several stated that they either had been responsible for setting schedules in the past or they knew of ASMs who prepared the store schedule.  Regarding annual and semi-annual appraisals of employee "productivity and efficiency," several ASMs stated that their involvement was limited to providing feedback to a supervisor, others completed the evaluations themselves, and yet another testified that his involvement in the evaluation process depended on which store he was working in.  Finally, as to "disciplining employees," several plaintiffs stated they did not have the authority to discipline an associate, while other ASMs stated that they did have the authority to discipline associate staff.  As a result, an examination of the plaintiffs' "actual duties" demonstrates great variations in areas identified by the Code of Federal Regulations as management responsibilities. Thus, the Massachusetts plaintiffs have failed to show that their jobs were similar in ways material to the establishment of the exemption criteria.

Consequently, the Massachusetts plaintiffs have failed to show by a preponderance of the evidence that common issues would predominate over individual ones in determining whether the Massachusetts ASMs are legally entitled to overtime, and the motion to certify the Massachusetts class is being denied.

**B.   Decertification of the FLSA Collective Action**

Any employer who violates the minimum wage or overtime requirements of the Fair Labor Standards Act may have an action brought against it by "one or more employees for and on behalf of themselves and other employees similarly situated."  29 U.S.C. § 216.  "[S]uch a joint, or collective, action requires potential plaintiffs to opt in to the suit in order to benefit from any judgment."  Perkins v. Southern New England Telephone Co., 669 F. Supp. 2d 212, 217 (D. Conn. 2009) (quoting Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 618 (D. Conn. 2007)) (alterations in original).  While "the Second Circuit has not articulated a test for certification of an FLSA collective action[,] . . . [d]istrict courts in this circuit have undertaken a two-stage inquiry."  Id.

> The first step in determining whether a suit pursuant to the FLSA may proceed as a collective action is for the court to determine whether the proposed class members are similarly situated.  If the court concludes the proposed members are similarly situated, then the collective action will be conditionally certified.  The second step of the analysis "occurs upon completion of discovery."  "A court, often prompted by a motion for decertification by the defendant, will examine all the evidence then in the record to determine whether there is a sufficient basis to conclude that the proposed class members are similarly situated."  The court's findings on the motion for decertification constitutes the second step in the two-part inquiry.

Id. (internal citations omitted).

On May 17, 2010, the court conditionally certified the FLSA collective action and authorized the plaintiff to send notice to

31

individuals identified as potential opt-in plaintiffs.  Twenty-
five individuals have opted in.  The defendant has filed a motion
for decertification, thus triggering the second step of the two-
stage inquiry.

Courts in this district have analyzed whether plaintiffs are
"similarly situated" during the second stage of the analysis by
reviewing three factors: "(1) disparate factual and employment
settings of the individual plaintiffs; (2) the various defenses
available to the defendant which appear to be individual to each
plaintiff; [and] (3) fairness and procedural considerations."
Id. at 217-18 (alterations in original).[8]  "Although this second
step involves a 'higher standard' in analysis of the 'similarly
situated' question [than did the first step], it is still
'considerably less stringent than the requirement of Fed. R. Civ.

---

[8]  The defendant observes that there is a recent trend of
courts denying certification in class-based proceedings in the
retail industry.  The court has already rejected the defendant's
argument that retail industry cases are inappropriate for
collective action certification.  (See Doc. No. 42 at 10.)  "'Had
Congress intended to exclude misclassification claims from
collective actions, it would have done so.  Additionally, a
number of courts in this district have certified collective
actions for FLSA overtime claims.'" Id. (quoting Perkins, 669 F.
Supp. 2d at 218 (alterations in original)).
    The defendant also argues that Morrison's "nationwide"
collective action (which it concedes is not nationwide) is
overbroad, relying primarily on a case, Vasquez v. Vitamin
Shoppes, No. 10 Civ. 8820(LTS)(THK), 2011 WL 2693712 (S.D.N.Y.
July 11, 2011), where the court observed that the plaintiff's
"submission . . . is based entirely on his personal experience."
That is clearly not the case here, and in any event, the court
finds the argument unpersuasive.

P. 23(b)(3) that common questions predominate.'" Id. at 218.

### 1.   Disparate Factual and Employment Settings

The defendant argues that the evidence shows a material difference in the day-to-day job responsibilities of the opt-in plaintiffs.  In support of this assertion, Ocean State relies on testimony by the opt-in plaintiffs regarding the different management styles of various Store Managers, testimony by different plaintiffs regarding the perceived importance of an ASM's managerial responsibilities, actual differences in job responsibilities and, to the extent relevant, differences in time spent on managerial versus non-managerial tasks.

At the second stage, the "plaintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." Hendricks v. J.P. Morgan Chase Bank, N.A., 263 F.R.D. 78, 83 (D. Conn. 2009).  This requirement is "considerably less stringent" than the predominance requirement of Rule 23.  Perkins, 669 F. Supp. 2d at 218.  "A collective action should be certified if, 'on balance, the differences among the plaintiffs do not outweigh the similarities in the practices to which they claim to have been subjected." Id. at 219.  Furthermore, "[a]t the certification stage, a court need not judge the merits of the plaintiffs' claims because they are irrelevant to the collective action inquiry, as long as

33

plaintiffs assert a plausible basis for their claim." Id.[9]

The plaintiffs' here were all subject to a single exemption determination, made after Ocean State had spoken with a sample of the ASMs employed at the time.  Based on those conversations, the defendant felt comfortable classifying all ASMs as exempt.  As of the time of his deposition, Vice President of Operations Richard Portno continued to assert that the exemption classification is correct for 100% of the ASMs based on his understanding that the defendant "give[s] them enhanced salary, . . . give[s] them enhanced benefits, and . . . expect[s] them to manage; and that is their primary function, to manage the employees in the store, to hire and fire, to discipline and promote and reward and overall operations of the store . . ." (Dep. of Richard Portno, supra, at 7.)  Ocean State's perception of the plaintiffs' job positions as sufficiently similar to support a single exemption determination is probative of the actual similarity amongst the plaintiffs.  Each of the opt-in plaintiffs is an ASM with job responsibilities dictated by a single position description.  They all underwent uniform training, which prepared them for an ASM

---

[9] The principle that courts do not judge the merits of a claim in considering whether plaintiffs are "similarly situated" for purposes of 216(b) distinguishes this analysis from the commonality and predominance analyses under Rule 23.  See Dukes, 131 S. Ct. at 2551 (The "rigorous analysis" to determine whether certification is proper will frequently "entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.").

position within any of Ocean State's stores.

There are a number of variations in the actual job duties identified by the plaintiffs during their depositions, some of which are attributed to varying management styles of the Store Managers.  However, under § 216(b) the court does not consider arguments pertaining directly to the merits of the underlying claim.  See id. at 221 ("[T]hese arguments go to the merits of the plaintiffs' claims, which is not proper for the court to consider at the collective action stage.")  "Merely because some class members 'spend[] . . . time on somewhat different specific assignments' does not mean that these employees are not 'similarly situated' under FLSA." Id. at 220.

Taking the evidence as a whole, the court concludes that the plaintiffs have met their burden of demonstrating that overall, while their job duties are not identical, the similarities among them are not outweighed by the differences.[10]

## 2.  Potential Defenses

The defendant argues that it will be able to raise numerous individual defenses as to Morrison that would dominate any

---

[10]The defendant contends that the court should discredit the plaintiffs' deposition testimony because it is allegedly inconsistent with their resumes.  The court does not find this argument persuasive.  It is unsurprising that an employee would choose to emphasize in a resume managerial tasks, such as hiring or training new employees, over non-managerial tasks, such as cleaning the bathrooms or bringing in carriages, even where the managerial tasks took up significantly less of the employee's time.

"representative" trial, and therefore, he is not similarly situated to the opt-in plaintiffs.  Many of these arguments are the same as those made challenging Morrison's adequacy to serve as a class representative under Rule 23.  The court finds these arguments unpersuasive for the reasons discussed in the analysis with respect to Rule 23.

The defendant also argues that Morrison is unique in that he claims his salary was docked and there is no evidence that any of the opt-in plaintiffs make the same claim.  However, the plaintiffs have abandoned any claim that may be made on Morrison's behalf that his salary was docked in violation of the FLSA.  (See Pl. Br. in Opp. to Mot. to Decertify, (Doc. No. 194) at 16.)

The court concludes, based on the evidence provided, that the factor of potential defenses weighs in favor of certification of the collective action.

### 3.  Fairness and Procedural Considerations

In Perkins, the court recognized that the

> FLSA is a remedial statute and thus, federal courts should give it a liberal construction.  The Supreme Court has held that a FLSA collective action allows plaintiffs to take "advantage of lower individual costs to vindicate rights by the pooling of resources," and allows the judicial system to benefit by "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [violation]."

Id. at 221.  Twenty-five plaintiffs have opted in to this action.

Litigating overtime claims for each of these plaintiffs individually would be burdensome on those plaintiffs, the defendant, and the courts.  As a result, both fairness and procedural considerations weigh heavily in favor of certifying the class.

## III. CONCLUSION

For the foregoing reasons the Plaintiffs' Motion for Class Certification (Doc. No. 148) is hereby GRANTED in part and DENIED in part.  The motion for class certification is being granted as to the Connecticut class of plaintiffs, and being denied as to the Massachusetts class of plaintiffs.  The Defendant's Motion to Decertify FLSA Collective Action (Doc. No. 184) is hereby DENIED.

It is so ordered.

Signed this 22nd day of March, 2013 at Hartford, Connecticut.


---
                    /s/AWT
              Alvin W. Thompson
          United States District Judge